STATE OF IOWA, appellee, v. ALFRED L. SEALES, appellant.

No. 48136.

(Reported in 65 N.W.2d 448)

JULY 26, 1954.

Paul Ferguson, of Shenandoah, for appellant.

Leo A. Hoegh, Attorney General, Raphael R. R. Dvorak, Assistant Attorney General, and Max C. Turner, County Attorney, Page County, for appellee.

MULRONEY, J.—In this appeal from defendant's conviction of statutory rape (on a minor child of the age of fourteen years) one of the assigned errors is lack of corroboration. To show the argument on this assigned error it will be necessary to make a brief review of all of the testimony.

In the month of May 1951, Mr. and Mrs. Alfred Seales arrived in Clarinda and rented an apartment in Mrs. Keeler's home. They had their home-made house trailer parked near the house and they began carrying on a sewing machine business in the town. They lived in the apartment and their business was conducted in two rooms in the house apartment and by canvassing the homes in the town for repair jobs and for sales of new machines. Mr. Seales did the repair work and Mrs. Seales and a girl they employed helped with the house-to-house canvassing. Prior to June 1951 they had a young girl in their employ named Rose Simmons, but she quit and the prosecuting witness, Betty Lee, was hired to take her place.

Betty Lee was fourteen years and about eleven months old in June of 1951. At that time she was living with her mother and her younger sister and brother, Joyce and Wayne, in their home in Clarinda. The record indicates Betty's father, a truck driver, was seldom in the home. At the time of trial both Betty and Joyce were inmates of the Glenwood State School for feeble minded and Mrs. Lee was living in Omaha and Wayne was living with her. There is much uncertainty and contradiction in the State's evidence as to the alleged rape and it is evident that much of it is caused by the subnormal intelligence of Betty Lee. Dr. Carl Catlin, a psychiatrist employed at the screening center at the State Mental Health Institute at Clarinda, was the State's first witness. He examined Betty on June 22, 1951, and testified that she had an I.Q. of about fifty, and further stated: "Betty Lee was given a Wexler Belvue Intelligence scale test under my supervision. It is a combined verbal and performance test which gives a measurement of the intelligence level. The normal average would be 100. Mental deficiency is considered to begin with a figure below 70. Betty Lee tested 65. In addition to the test I formed an opinion as to Betty Lee's alertness. She seemed dull and rather disinterested. She didn't offer any information spontaneously."

I. The story, which the attorney general argues is told by the State's evidence, is that Mr. Seales went to the home of Mrs. Lee on Thursday, June 7, 1951, and asked Mrs. Lee if her daughter Betty could work for him. The job was to help Mrs. Seales with the housework, dust the sewing machines, and do canvassing work with Mrs. Seales. She was to be paid $2.00 a day. Mrs. Lee consented to the employment of her daughter, and Mr. Seales took her to meet his wife that evening and she was instructed in the work she was to do and she reported for work the next morning, Friday, June 8, 1951. Sometime that morning, or else the next morning, June 9, 1951, Mrs. Seales sent Betty to the trailer to get some potatoes and when she returned with the potatoes Mr. Seales sent her back out to the trailer. Mr. Seales followed her into the trailer, locked the door, pulled the curtains over the windows, and put paper over the window in the door and laid Betty down on a mattress and removed her panties and had intercourse with her.

This story is told by the State's evidence but it is almost entirely told by Betty's responses to leading questions by the county attorney. Defendant's counsel made repeated objections to the questions but the trial court overruled the objections, stating that much latitude to lead the witness would be granted —probably because of her youth and subnormal mentality. The frightening thing about this testimony though is the ease with which she was led into contradictory answers on cross-examination by the same type of leading questions. It seems that about a week before the trial defendant's counsel interviewed Betty at the Glenwood State School for feeble minded. This interview (Betty was not sworn as a witness) was in the presence of the county attorney and the school authorities, and a wire recording of the interview was made. A transcript of this interview was admitted in evidence by agreement. Defendant's cross-examination of Betty was based upon many of her answers made in this interview. Here in answer to some leading questions by defendant's counsel she sometimes said the whole story was false. The following is a portion of her cross-examination where defendant's counsel was interrogating her with respect to some statements she had made in the interview:

"Q: Betty, I want to ask you if I didn't ask you this question up there [Glenwood]. Are you telling this story because your mother told you to? Isn't that why you are telling the story because your mother told you to, aren't you? A. Yes. Q. Isn't that right? A. Yes. Q. And that actually it didn't happen at all. You went home and told your mother you didn't want to work and that happened and that's why you stuck to the story all the way through both times; before the Grand Jury and today. Is that right? And you said 'yes.' Now, isn't that the answer you made up there? You said that, made that answer to my question, didn't you? A. Yes. Q. And that's the truth, is it not Betty? A. Yes."

There are many other conflicts in her testimony. The defendant does not assign error on the rulings on the objections to leading questions but we believe it is important to point out that the State's evidence to establish the rape is something less than strong. It is admitted the rape can be established by the evi-

dence of the prosecuting witness alone and the State points to two other bits of evidence that tend to corroborate her story of the rape.

The first is the testimony of Doctor Catlin who also made a physical examination of Betty on June 22, 1951. He said "there were rudiments of the hymen left which would indicate she had had sexual intercourse." Since Betty also admitted she had had sexual intercourse before with other Clarinda boys, the doctor's evidence is not much corroboration of her story of the rape occurring on June 8 or 9.

The other testimony which the State argues corroborates Betty's story of the rape is the testimony about her telling the story to her mother. Just when Betty told this story to her mother is much in doubt. Sometimes Betty says the incident in the trailer occurred on Saturday, her second day of work. One place she says she went home right after the incident and told her mother and at other times she says she went back into the house. Mrs. Lee's version of the telling is that she asked Betty (probably on Saturday) if defendant had "tried to make her" and she said he had tried. Mrs. Lee said: "On Sunday she told an entirely different story from the one she had told on Saturday." She said she continued to talk to Betty on Monday, and on Tuesday the county attorney called on her, and Tuesday night after the county attorney had gone she took Betty into the bedroom and told her the county attorney had been there and she would have to tell the truth. The county attorney experienced much difficulty in getting Mrs. Lee to testify as to what Betty told her in the bedroom. After repeated efforts all he could get her to say was that Betty told her "it happened in the trailer." The defendant assigns the admission of this testimony of the mother, over the objection of hearsay, as error. The State admits it was not part of the res gestae but argues its admissibility as a corroborative fact to support Betty's story of the rape. Without deciding the admissibility of this evidence we see little if any corroborative value in this testimony. The mother's and daughter's stories of the telling of what occurred do not agree as to time. It is, according to the mother's testimony, a disclosure after days of questioning. It seems strange that the mother would let the child go back to

work where, in the mother's language, the child's employer had "tried to make her." Under all of the testimony it clearly appears Betty worked until Monday noon when Mr. and Mrs. Seales brought her home and said they "couldn't use her any more."

Giving the utmost consideration to all of the State's evidence, including the evidence which the State contends corroborates the story of the prosecuting witness, we feel the evidence of the rape was weak. When we speak of corroboration here we do not mean the statutory corroboration which will be dealt with in the next division. We think it important to point to the weaknesses in the evidence of the rape, for here, as in most all rape cases, the central question is the sufficiency of other testimony that tends to connect defendant with the crime. With clear and convincing evidence that the crime of rape was perpetrated by someone at a certain fixed time, an accused's connection with the crime can be more easily established. Here there is doubt as to the day the rape occurred. The indictment names June 8, or Friday, and Betty's testimony leaves it as occurring that day or the next day. Mrs. Lee says she asked Betty if defendant had tried to "make her" before Saturday and she said that "he hadn't."

 II. So the State is left with the burden of introducing evidence tending to establish defendant's connection with a rape that occurred on Friday or Saturday. Section 782.4, Code, 1954, provides, stating it affirmatively, that the story of the prosecuting witness must be "corroborated by other evidence tending to connect the defendant with the commission of the crime." The other evidence introduced by the State was the testimony of persons who saw Betty and defendant go in or come out of the trailer.

Thirteen-year-old Marla Wilson who lived next door to the Keeler home said she saw Betty and Mr. Seales come out of the trailer. She "believed" the date was Saturday, June 9, in the morning. She did not see them go in and she did not remember who came out first.

Marla's eighteen-year-old brother, Ronald Wilson, testified he remembered seeing Betty Lee and defendant come out of

the trailer. He did not remember who came out first and he could not recall whether it was morning or afternoon, the day of the week or month, but he remembered it was during the summer vacation.

Seventeen-year-old Bob Keeler could not remember whether Rose Simmons worked for Mr. Seales before Betty Lee but he remembered both of them and he recalled seeing Betty Lee and defendant go into the trailer house along about noon sometime on a day the previous summer. He said there were curtains over the windows and a newspaper over the door. He remembered Betty went in first and came out first but he had no recollection how long they were in the trailer.

This was the extent of the corroborating evidence at the close of the State's case. One more corroborating witness was introduced by the State in rebuttal. She was Mrs. Keeler who rented the two-room apartment in her home to defendant. She was asked if she was at her home the morning of June 9 and she said she was and she saw Betty and defendant go into the trailer about eleven o'clock that morning. She could not say how long they were in the trailer before Betty came out. All she could say was that it was long enough for her to "iron a shirt." She said it was "quite a little while" later that defendant came out of the trailer. She testified that she did not get along with Betty, who was her third cousin, and had previously considered her an unfit person to have around her home and her children. Sometime after she saw Betty come out of the trailer she ordered her off of the place and she called her a "little whore."

The most that can be said for this testimony is that it shows mere opportunity on the part of defendant. Opportunity alone at the time and place relied upon by the State is not sufficient to corroborate the prosecutrix. State v. Hook, 242 Iowa 255, 45 N.W.2d 858, and cases there cited. It does not clearly appear in the record what use was being made of the trailer when defendant and his wife were living in the apartment in the house. It was not being used as a bedroom. Some food was kept there, for Mrs. Seales remembered sending Betty to the trailer for potatoes. She also said defendant and Betty went to the trailer on Saturday, June 9, to hang paper curtains and

she joined them in a few moments and helped them and when the job was finished they all went to a neighboring restaurant for lunch. She said Betty was with her during all of the time during the two and a half days she worked with the exception of two or three minutes when she finished drying the dishes before she joined them in the trailer to hang curtains.

██ Defendant was not charged with carnal knowledge of an imbecile (section 698.3, Code, 1954) so the record must be scanned to see if there be sufficient corroborative evidence to justify the verdict of guilty of rape of a child under the age of sixteen. There is no doubt that the State was at a disadvantage because of the subnormal intelligence of the prosecuting witness. But the infirmity of her intellect will not permit a lesser quantum of proof than that required by the statute the defendant was accused of violating. The hard requirements of the statute with respect to corroborative evidence must be met. Without further comment we hold the corroborative testimony insufficient and the motion for directed verdict should have been sustained.

██ III. There is another error in the case upon which we desire to comment. The indictment also charged defendant with being a habitual criminal under section 747.5, Code, 1950, and it alleged his convictions of two felonies in Indiana and one in Michigan. The jury found defendant guilty of the habitual criminal charge and defendant asserts error in that the proof of two of the prior felonies was by records of the Federal Bureau of Investigation. The court admitted photostatic copies of pictures and fingerprints and record data which had been sent to the Federal Bureau of Investigation by penitentiaries, and a fingerprint examiner for the federal bureau compared defendant's fingerprints with those on the exhibits. The exhibits should not have been admitted over the objection of hearsay and not the best evidence. The witness said he had no personal knowledge of the origin of the exhibits except from the data thereon. They were made up someplace and merely sent to the F. B. I. for their files and he had taken them from the files when coming to Iowa to testify in the case. The court rightly admitted certified copies of the judgments and commitments for

the felonies in Indiana and Michigan but proper proof of identification of defendant as the person named in such judgments and commitments was not made by the F. B. I. files and testimony of the F. B. I. fingerprint examiner.

The cause is reversed.—Reversed.

All JUSTICES concur.